DAVID W. BURLESON AND PATRICIA S. BURLESON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Burleson v. Commissioner
Docket No. 4237-92.
United States Tax Court
T.C. Memo 1994-130; 1994 Tax Ct. Memo LEXIS 138; 67 T.C.M. (CCH) 2517; March 29, 1994, Filed *138 Decision will be entered under Rule 155. David W. Burleson and Patricia S. Burleson, pro se. Michael W. Lloyd, for respondent. RAUM
RAUM
MEMORANDUM OPINION RAUM, Judge: The Commissioner determined an income tax deficiency of $ 2,013 against petitioners for the year 1988. After concessions, the issues remaining for decision involve deductions claimed by petitioners under section 162 for certain transportation expenses, laundry expenses, and professional fees. [1] The facts have been stipulated. All references to petitioner in the singular are to petitioner David W. Burleson. Petitioners resided in Hill City, South Dakota (Hill City), at the time that they filed their petition. Petitioner worked as a woodcutter at various job sites in the Black Hills National Forest area (Black Hills Forest or Forest) of South Dakota *139 from 1981 through 1988. [2] There is no dispute that he was self-employed during 1988, the year at issue. Petitioner worked with timber contractors in 1988. He performed the actual cutting work, exclusively at various job sites in the Black Hills Forest. However, petitioner's oral acceptance or nonacceptance of proposed woodcutting contracts was transacted through telephone conversations and visits to the proposed cutting sites. During 1988, petitioners lived in a mobile home on a lot located 10-1/2 miles west of Hill City. The lot on which petitioners' residence sits had no garage and had a workshop appurtenant to the residence. The workshop was used by petitioner for purposes related to his woodcutting work, including the maintenance and repair of equipment [3] owned and used by him in his woodcutting work, and the warehousing of cutting and vehicle supplies. *140 During 1988, petitioner spent between 40 to 60 hours per week performing cutting services at the various cutting sites within the Forest. During that same year, petitioner spent an average of 7 hours per week in the workshop working on the maintenance and repair of equipment. And he spent an average of 1 hour per week in 1988 performing administrative tasks such as recordkeeping [4] in petitioners' residence. Petitioner used a stock four-wheel drive 1986 Chevrolet pick-up truck to drive himself and his equipment between his residence and cutting sites. Conditions encountered *141 by petitioner in driving from his residence to the first cutting site in the Black Hills Forest and from the last cutting site of the day back to his residence required that the truck driven by him be operated in its four-wheel drive mode 50 percent of the time. In its two-wheel drive mode, petitioner's truck normally got 13 miles per gallon without logging equipment in it and 12 miles per gallon with the logging equipment in it. In its four-wheel drive mode, petitioner's truck normally got 8 miles per gallon without the logging equipment in it and 7 miles per gallon with the logging equipment in it. The foregoing materials relating to the conduct of petitioner's business are based entirely upon facts contained in the stipulation of the parties. In addition the parties have stipulated to a statement of testimony that petitioner would give as a witness. That testimony sets forth in far greater and more meaningful detail the nature of petitioner's work. The Government has not challenged the truth of a single fact set forth in that statement of testimony. It appears credible and we accept it at face. It is reproduced in full in the appendix to this opinion. On Schedule C [5] *142 of their 1988 U.S. Individual Income Tax Return (Federal Form 1040), petitioners deducted $ 5,473 for various expenses relating to use of his truck in his woodcutting activities. The $ 5,473 total consisted of the following items: $ 1,711 for car and trucking expenses, $ 1,382 for depreciation, $ 581 for insurance, $ 693 for interest, and $ 1,106 for repairs. The Commissioner disallowed $ 4,993 of the $ 5,473 deduction taken by petitioners on Schedule C of their 1988 tax return. The parties have stipulated that the $ 4,993 disallowed amount "represents expenses associated with driving from David Burleson's personal residence to the initial cutting site of the work day, and expenses associated with driving from the last cutting site of the work day back to David Burleson's personal residence." The Commissioner also disallowed Schedule *143 C deductions of $ 242 for "Laundry and cleaning" and $ 55 for "Legal and professional services". Petitioners explain the $ 242 deduction as representing the cost of cleaning heavily soiled logging clothing and washing petitioner's truck. The stipulated materials establish that the $ 55 deduction represents the cost of having their income tax return prepared. As to the major item of expense disallowed by the Commissioner, $ 4,993 transportation costs, precisely the same issue was recently decided in favor of the woodcutter in Walker v. Commissioner, 101 T.C.     (1993), a case substantially indistinguishable from the present case. The taxpayer there also worked as a cutter in the Black Hills Forest. Like petitioner, he traveled in a truck back and forth from his personal residence to various sites in the Forest to cut timber; he carried his tools in the truck, and he maintained a workshop appurtenant to his home in which he stored, maintained, and repaired his equipment. Like petitioner, the taxpayer in Walker spent "approximately 7 hours per week" in his workshop for such tasks, and, like petitioner, he used his residence to arrange for his cutting assignments. The *144 Government makes a strong frontal attack upon Walker, but we are not inclined to revisit the issue, particularly since Walker has been followed in a number of other recent cases involving cutters similarly working in the Black Hills Forest: Burleson v. Commissioner, T.C. Memo. 1993-625; [6]Callison v. Commissioner, T.C. Memo. 1993-626; Boice v. Commissioner, T.C. Memo. 1993-627; Nikkila v. Commissioner, T.C. Memo. 1993-628. We hold for petitioner on this issue. The Government supports its position on the disallowance of the $ 242 "Laundry and cleaning" deduction on the ground that the record is entirely devoid of any evidence showing that any expenditure was made in 1988 for such purpose. Petitioners argue on brief that $ 242 was spent to clean petitioner's heavily soiled logging clothing and to wash his *145 truck. The amount is modest, and if there were credible evidence in the record that any expenditures were made for that purpose we would be inclined to find that the expenditures in the amount claimed were in fact made, and we would then be faced with the question whether they were legally deductible. However, in the absence of any supporting evidence, we must decide this issue for the Commissioner. Statements of fact on brief, although reasonable, do not satisfy the requirement that such facts must be based on materials in the record. In respect of the final item involving the $ 55 deduction for "Legal and professional services", the record does establish that $ 55 was paid for the preparation of petitioners' 1988 joint return. However, the return involved not only matters relating to the husband's work as a cutter, but also income received by the wife. Perhaps an allocation could be made between the husband's business on Schedule C and the remainder as personal that could be taken as a miscellaneous itemized deduction on Schedule A, which, however, would be limited to the excess over 2 percent of adjusted gross income, see section 67, and in any event would not be deductible *146 by petitioners because they did not itemize their deductions but instead took the $ 5,000 standard deduction. See section 63. On the whole, it is our best judgment that the return was concerned predominantly with the husband's work as a cutter, and, disregarding any portion of the $ 55 not relating to the husband's business as de minimis in the context of this case, we hold that the entire $ 55 should be treated as deductible on Schedule C. A final word on this last item. It seems to us that the disallowance of this $ 55 deduction reflects a misguided zeal of the revenue agent, his or her superior who approved the determination, and Government counsel and his superior who continued to defend the disallowance of the deduction before this Court. The continued stubborn position of the IRS was not only petty but also impractical when one considers that the amount of additional tax attributable to this $ 55 item would be minimal in view of petitioners' low tax bracket. It would seem that IRS manpower could be more usefully employed in more productive areas. Decision will be entered under Rule 155. APPENDIX OUTLINE OF TYPICAL DAY FOR A LOGGER IN THE BLACK HILLS To get *147 started on a job the first thing I did was get on the telephone and start calling contractors that I knew in the area, that were respectable contractors. I called and asked if they had any cutter jobs available, alot of times contractors did not need any cutters, so you go down your list until you find ones that had jobs available, and you set up with 2 or 3 contractors and negotiated price, I got directions on how to get to their timber sale and if they would be available and at what time to show me what they needed done. I made appointments with several different contractors, discussed and negotiated again in the the woods after looking at the wood they needed cut and sizing up what type of equipment I will need and how long it will take me. I generally went home to think out the pros and cons and called other cutters who worked for those individual contractors to see how reputable they were and then made my decision from all of the above information. Once I decided which contractor had the better deal, we negotiated price and had a verbal contract then I went to work. After the initial verbal contract, the only time I seen the contractor was when there was a problem and *148 he usually called my at my home in the evening. I was not required to work specific hours or days and usually was paid by the poundage of timber. I only got paid if the wood was hauled to the sawmills. There were times when my wood layed in the woods for months, because of the weather the truckers could not get to haul. I would not receive any pay for that until it was hauled to the sawmill. I needed to load up my pickup with all the essential equipment, that I decided I needed to accomplish this job. I furnished my own truck, tools, fuel and supplies. I usually carried 3 chain saws with me, because of the possibility of breakdowns, it was too far to drive back to my workshop where the electricity to operate the tools needed to fix the saws were. I was on my own, all the contractor wanted to see, was the job finished in a timely manner and that all Forest Service rules were followed, I was liable for any damage I did to the sale and was required to pay for the cost of repair. Also, I received no sick or health benefits and was not elgible to participate in a retirement plan. I drove to the cutting site, trying to use the shortest route possible, but that was only possible *149 in good weather. During snowmobile season, the State of South Dakota and the Forest Service closed roads to vehicular travel and you usually had an extra 10 to 50 miles extra to drive depending on your location. Also in the winter the roads were not kept open, so you usually had to find county or state roads that were maintained in the winter and use them to get to your cutting site. Once I did arrive at the site, I looked over your unit and decided what was the best way to start the unit and how the trees needed to be fell, so the skidder operator could retrieve them up to a landing without damage to other resources. My job as a cutter involved; cutting the tree, delimbing the tree, measure out the logs to lengths of 10', 12', 14', or 16', using whichever lenght would utilize the most of that tree, after you cut the tree down there is brush, that needs to be cut to lay only 18 inches off the ground, this was a Forest Service requirement that if not done to their acceptance, that I would be back to that site to brush to their acceptance. While doing your cutting, you had to always keep in mind to fall your trees all the same way, keep your stumps low and keep the brush low enough *150 to the ground so the skidder operator could find your trees and cable them in an easy fast manner. If there were complaints, the contractor had the right to tell you to hit the road and anything you had cut but not hauled, usually belonged to the contractor then. The contractor did not train you in any of the Forest Service rules or the logging ways, it was up to me as a subcontractor to know what length to cut the trees, so the sawmills would accept them and the minimum size tree to cut for this particular sale, each timber sale could be different, also you needed to look at the trees and see if there was any defect, if there was, it was up to me to decide how to get the straightest board out of the tree. The sawmills will not take trees that have too much curve or rot, so if you cut them and then the sawmill decides that it cannot utililze that tree, you will not get paid for it. I usually tried to put in between and 8 and 12 hour day, then if I went through a whole day with no major breakdowns on my chainsaws, I would drive home and my route during 1988 did not take me to the nearest town to where I could purchase fuel for my truck and needed supplies and fuel for my chainsaws, *151 so I usually had to drive another 10 and 1/2 miles to town to purchase these items, so I would be ready to start my next day. If I had a major breakdown on my saw, the only saw shop was only open until 6pm and you would quit work early to get in to get the part fixed or purchase the new part you need. Most businesses were not open at the time I would generally leave for work, so I did that business in the evening. Once I did get home, I took my chainsaws up to my work shop that is adjacent to my home and did nightly maintenance on them; which included doing a good thorough sharpening, checking over the bar to see if it was capable of running through another day, cleaning out the carburetor, checking for leaks and then filling up with mixed saw gas and oil for the bar. The cutting units were only temporary, it usually took about 1-2 months to finish a unit, (there were anywhere from 5 to 20 units per timber sale, but negotiations were done before entering each unit), depending on weather and saw breakdowns and anything else that slow it down. If everything went well and you and the contractor agreed, you would negotiate for another unit on this sale or maybe it could be another *152 sale the contractor was working on. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. It has been stipulated that "David Burleson's 1988 reporting of his cutting income on a Schedule C, as a self-employed person, is not at issue in this case."↩
3. Petitioner's equipment included tow chains, chain saws, axes, hatchets, shovels, bars, wrenches, hammers, and various other tools and equipment related to woodcutting equipment.↩
4. During 1988, petitioners' recordkeeping consisted of maintaining files of third-party receipts.↩
5. Schedule C (entitled "Profit or Loss From Business") of Form 1040 is the schedule for reporting income and expenses relating to the business activities of a sole proprietorship.↩
6. The taxpayers in that case were not the same persons as petitioners herein.↩